# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION
# CIVIL CASE NO.

CECELIA JONES as parent, next of kin, and best friend, in/on behalf of and for her minor disabled daughter, J.J.,

    *Plaintiff,*

v.

THE SCHOOL BOARD OF MANATEE COUNTY, FLORIDA, A/K/A SCHOOL DISTRICT OF MANATEE COUNTY, FLORIDA, A/K/A MANATEE COUNTY SCHOOLS, a public school and Florida municipal and/or political subdivision; RICK WELLS in his official capacity as Sheriff of Manatee County, Florida, Sheriff's Office, a political subdivision in the state of Florida; JUDD BECKWITH in his individual capacity; and GEORGE SCHRENK in his individual capacity,

    *Defendants.*

_____

## COMPLAINT WITH DEMAND FOR JURY TRIAL

COMES NOW Plaintiff, **CECELIA JONES as parent, next of kin, and best friend, in/on behalf of and for her minor disabled daughter, J.J.,** by and

through her undersigned counsel, and files this *Complaint With Demand for Jury Trial* against **THE SCHOOL BOARD OF MANATEE COUNTY, FLORIDA, A/K/A SCHOOL DISTRICT OF MANATEE COUNTY, FLORIDA, A/K/A MANATEE COUNTY SCHOOLS**, a public school and Florida municipal and/or political subdivision; **RICK WELLS** in his official capacity as Sheriff of the Manatee County, Florida, Sheriff's Office, a political subdivision in the state of Florida; **JUDD BECKWITH** in his individual capacity; and **GEORGE SCHRENK** in his individual capacity, and so states:

## I.
## NATURE OF THIS ACTION

This is an action for damages in excess of $3,500,000.00 inclusive of Attorney's fees, costs and interests, for damages Defendants, a government entity public school acting under color of law,  Sheriff's Office acting under color of law, and two on-duty sworn law enforcement officers acting under color of law sued in their individual capacities, caused disabled minor student 12-year-old  J.J. under Title II of the ADA, Fourth and Fourteenth Amendments; *Monell;* and Florida state law.

## II.

## JURISDICTION, VENUE, AND PARTIES

1. Jurisdiction is properly invoked in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(3) and (4), 42 U.S.C. §1983 and §1988, the ADA Title II, 28 CFR Part 35.130(a), 49 C.F.R. §27 as the enabling statute; 29 U.S.C. §794(a), 28 U.S.C.A. §2201, 2202 and 42 U.S.C.A. §12101 et seq., the Fourth and Fourteenth Amendments to the U.S. Constitution, wherein the claims herein arise under the U.S. Constitution and laws of the United States, with 42 U.S.C. §1983 as the enabling statute.

2. Supplemental jurisdiction for state law claims is proper under 28 U.S.C. §1367(a), because the facts giving rise to these claims form part of the same case or controversy in federal and state law.

3. Venue is properly invoked under 28 U.S.C. §1391(b) insofar that all events giving rise to this Complaint occurred at Defendant Manatee's public school system/place of business and were committed there by all Defendants at *Palm View* K-8 school located in Manatee County, Florida; on school days during regular operating school hours wherein its students and staff were present on campus; Plaintiff resides in Manatee County, Florida; J.J. attends school in Manatee County, Florida at all

times material hereto; and, Manatee County, Florida, is physically located within this District Court's judicial district and division.

4. Plaintiff, J.J., at all times material hereto, was a minor disabled elementary student residing in Manatee County, Florida, with her parent, next of kin, and best friend, Cecilia Jones; attending public school in Manatee County, Florida, at Palm View K - 8; and on an IEP for her disabilities. She is a member of a protected class based on her disabilities and has federally protected rights related to her disability under the ADA and I.D.E.A; the right to be free from unlawful detention, imprisonment, arrest, and excessive force, under the Fourth Amendment; the right to equal protection under the Fourteenth Amendments; and state law rights to be free from false arrest/false imprisonment, battery, and negligence. Her clearly established constitutional rights of which Defendants were on notice, and her rights under federal and states laws, were violated by all Defendants Manatee, MCSO, Beckwith, and Schrenk, causing her substantial damages. Cecilia and J.J. are residents of Manatee County, Florida, and otherwise *sui juris*. <u>All charges against J.J. were dropped.</u>

5. Defendant, THE SCHOOL BOARD OF MANATEE COUNTY, FLORIDA, A/K/A SCHOOL DISTRICT OF MANATEE COUNTY, FLORIDA, A/K/A MANATEE COUNTY SCHOOLS, ("Manatee") is a government entity public school and Florida municipal and/or political subdivision, acting under color of law through its agents, representatives, employees, staff, assigns, and/or school board including its superintendent, and receiving federal funds, which deprived J.J. of her clearly established constitutional rights under the Fourth and Fourteenth Amendments of which it was on notice, and federal and state laws, and *Monell* for its municipal liability of proven widespread custom and pattern of constitutional and federal deprivations of its disabled students to include J.J. Its principal place of business is in the city of Bradenton, Manatee County, Florida. Manatee operates as a public school and political subdivision subject to civil suit because it operates, controls, and supervises all public schools in its district, and is empowered to make and establish policies for its school system, pursuant to Article IX, §4(b) of the Florida Constitution, and F.S. §1001.32(2) and 1001.41(4), and is a person

acting under color of state law pursuant to 42 U.S.C. §1983. Manatee receives federal public funds and is subject to federal and state laws and the U.S. Constitution. Its final decision and policy maker(s) are its School Board and/or Superintendent, who at all times material hereto were on notice of its violations against J.J. <u>not only from her mother, but also the Florida Dept. of Education ("DOE") found that Manatee violated J.J.'s rights, and a practice, pattern, and/or policy of Manatee violating the same or similar rights against multiple disabled students existed during that same time, when it investigated J.J.'s complaint against Manatee. Manatee's violations against J.J. were also evidenced during an administrative hearing at DOAH</u>. At all times material hereto, on-duty MCSO deputies were in place as School Resource Officers ("SRO") at Manatee, to include Defendants JUDD BECKWITH sued in his individual capacity; and GEORGE SCHRENK sued in his individual capacity, both at Palm View K – K where J.J. attended.

6. Defendant, RICK WELLS is sued in his official capacity as Sheriff of Manatee County, Florida, Sheriff's Office, a political subdivision in the

state of Florida is located in Manatee County, Florida.  The Manatee County Sheriff's Office ("MCSO") hires, supervises, trains, disciplines, sets policy and custom, for its officers;  is the final decision and policy maker for its sworn police officers;  and has a legal duty to ensure its officers are adequately trained and supervised in compliance with federal and states laws, its policy, and the U.S. Constitution, so as not to act unlawfully and/or violate the rights of the citizenry to include J.J.  MCSO is liable under *Monell* for its municipal liability in its acknowledged if not outright admitted custom of failure to train and supervise its officers, and under state law F.S. §768.28 *Respondeat Superior*, which waives sovereign immunity for specified torts claimed herein.   MCSO through its custom, policy of its final decision maker, and/or deliberate omissions and indifference ("custom"),  failed to adequately train and supervise its on-duty sworn deputies that it knew it was placing in schools as School Resource Officers ("SRO") where it was foreseeable that its deputies would engage children and be called upon by school staff to make arrests and other acts of law, to include its deputies  JUDD BECKWITH and

GEORGE SCHRENK who violated J.J.'s rights, where its custom of failing to train and supervise known all the way up to its final policy and decision-maker Sheriff Wells, was the moving force behind those deprivations against J.J.  In fact, <u>after</u> the deprivations against J.J., Sheriff Wells <u>then trained</u> all MCSO deputies, <u>admitting to the</u> major publication *The Bradenton Herald* that 1<u>) J.J. did **not** break any law</u> by recording on her cell phone; and 2) that he  <u>then</u> trained and  "*warned all Manatee County school resource officers about getting involved in cellphone issues or other school policies. "We have no basis to take action on such policies," Wells said. "That's not why we are there*."  ("*12-year-old girl arrested at Manatee school after officials wanted a fight video deleted,*"  12/17/21, www.bradenton.com/news/local/education/article256581741.html.)

Wells also admitted that his deputy Schrenk had called the MCSO for instruction regarding this situation prior to the time that J.J. was arrested and taken to the juvenile detention center.  *Id.*

7. Defendant, JUDD BECKWITH, ("Beckwith") is being sued in his individual capacity.  At all times material hereto, Beckwith was an on-

duty sworn law enforcement officer of the MCSO acting under color of law as a SRO who unlawfully detained, confined, arrested, and used force against 12-year-old female and disabled J.J. at Palm View K- 8 in Manatee County, Florida.  Body-worn camera/video footage shows Beckwith, a full-grown adults, said the following to 12-year-old disabled J.J. upon his arrival to the room where Manatee Principal Kathleen Johnson and other personnel had J.J. unlawfully confined against her will:

> *"You f****d up enough to the point where I have to come here. I ain't like these other guys," (pointing to the assistant principal and the campus deputy). "I don't deal with this s\*\*t." "Are you done with this tantrum or what? You just sit here and cry and beg for mom a little more"*

Beckwith also escorted J.J. out to his vehicle in handcuffs and took her to the juvenile detention center.  All charged against J.J. were dropped. Beckwith later received minimum discipline of a reprimand, and MCSO then promoted/assigned Beckwith to training other officers as a MCSO Field Training Officer ("FTO").

8. Defendant, GEORGE SCHRENK, ("Schrenk") is being sued in his individual capacity.  At all times material hereto, Schrenk was an on-duty

sworn law enforcement officer of the MCSO acting under color of law, and working as a SRO at Palm View K – 8, who unlawfully detained, confined, arrested, and used force against J.J.  Schrenk's body-worn-camera ("BWC") showed he and Manatee Principal Kathleen Johnson and other Manatee staff confining J.J. in that room against her will for about an hour, constantly threatening her, throwing her phone, and unlawfully physically pushing J.J. and taking her down to the floor against her will and without her consent more than once. He arrested J.J., handcuffed her. Schrenk deprived J.J. of her clearly established constitutional rights under the Fourth Amendment of which was on notice; and state law.

9.  This court has subject matter and personal jurisdiction over the parties.

10. All conditions precedent to the filing of this federal lawsuit have been met, satisfied or waived by Defendants.

### III.

### GENERAL ALLEGATIONS

11. Plaintiff renews and re-alleges paragraphs 1-10 as if plead herein.

12. At all times material hereto, J.J. was a 12-year-old disabled female student on an IEP at Manatee on September 22, 2021.

13. She was enrolled in Palm View K – 8 in Manatee, where Kathleen Johnson was the Principal and Mary Dietrick was a school counselor.

14. J.J. is a recognized/qualified individual with disabilities and member of a protected class based on her disabilities.

15. Due to her disabilities including ADHD and behavioral struggles, and her IEP for those disabilities including the intervention of de-escalation, at all times material hereto Manatee was on notice of her disabilities, required interventions, exacerbating and triggering factors, and the requirement for de-escalation to include proper de-escalation techniques.

16. Defendant Manatee, as operators and policy makers of its public school system, and as a public school receiving federal funds, was and is at all times material hereto, charged with the care and duty of care, custody, and control of minor children, and a duty to protect its disabled students from discrimination, exclusion, reprisal, and other violations of their rights under the ADA, federal and state laws, and the U.S. Constitution,

specifically here the Fourth and Fourteenth Amendments.

17. Manatee is also required to provide its disabled students with a Free and Appropriate Education ("FAPE"), lawful procedural safeguards, and to comply with the IEP pursuant to IDEA. Manatee owed these duties to J.J., and to all disabled studies attending its school on an IEP and/or 504.

18. Multiple times prior to the unlawful acts against J.J. giving rise to this Complaint, Manatee failed to comply with J.J.'s IEP as required by federal law, to include not following interventions, missed meetings, unlawful recommended removals, failure to provide needed services and accommodation, and failure to communicate with J.J.'s mother, Cecelia. Cecelia had complained to Manatee multiple times about the non-compliance to no avail, including through use of disability advocates.

19. In fact, Manatee failed to comply with multiple federal requirements of J.J.'s IEP pursuant to IDEA and FAPE as evidenced in the administrative process in Florida's Division of Administrative Hearing ("DOAH") <u>Case No. 21-003019E.</u>

20. Manatee was also found to have a pattern, custom, and/or policy of

multiple unlawful violations of J.J.'s IEP and the IEP's of multiple of its other disabled students in a complaint filed on behalf of J.J. with the FL Dept. of Education, Bureau of Exceptional Education and Student Services, <u>DOE Case No. BESE 2022-0140C</u>.

21. So on the day at issue of September 22 of all Defendants converging on J.J. and violating her rights, two students not associated with J.J. had a public fight on campus inside the school yard.

22. It is undisputed that J.J. was not one of those students nor involved in the fight in any way.

23. The school's video surveillance shows multiple students outside watching the fight, and many recorded the fight with their cellphones. J.J. also recorded the fight on her cellphone.

24. However, Manatee's Palm View K – 8 Principal Kathleen Johnson and other staff to include school counselor Mary Dietrick and security targeted and singled out J.J., *requiring* her to enter a separate room on campus, and secluding and confining her inside that room where they converged on J.J., confining her to the room against her will and without

her consent or the consent of her mother, demanding possession of her phone to delete the video of the fight, threatening her that she had committed a felony for recording the fight, and refusing to free J.J. despite her requests.

25. Principal Johnson and all involved staff were on-duty employees of Manatee acting under color of law and working during school hours on campus, at all times material hereto, with a duty to protect and safeguard the students in their care, custody, and control, including J.J.

26. J.J. was afraid and confused, crying and asking for her mother and to be released, to no avail.

27. Principal Johnson and the staff continued their targeting of this disabled student, exacerbating and escalating J.J.'s disability-related stress and behaviors, and her fear, mental anguish, and distress otherwise.

28. For approximately an hour, Principal Johnson and the staff kept J.J. confined in the room without her consent and against her will, threatening her, berating her, scaring her, without food or drink, causing her to walking in circles, cry out and beg for her mother to no avail.

29. They falsely and unlawfully told J.J. that she was committing a felony and would go to jail.

30. They threatened to call police on J.J.

31. J.J. was crying and asking to be released and for her mother.

32. J.J.'s IEP required *de*-escalation.

33. In fact, J.J.'s disability-related IEP at Manatee stated that J.J. had a tendency to become irritable quickly and had difficulty maintaining self - control when faced with adversity.

34. Manatee did not utilize the required de-escalation. They instead only exacerbated and distressed J.J.

35. Although no crime had been committed and without probable cause, reasonable articulable suspicion, or any legal justification, Principal Johnson and staff called and/or summoned MCSO deputies to the room where they had J.J. confined against her will to arrest J.J.

36. Manatee and the MCSO utilized on-duty MCSO deputies as School Resource Officers.

37. Principal Johnson and school counselor Dietrick told the MCSO that J.J.

had committed a crime by recording a fight on campus, and that they wanted her arrested for a felony for recording the fight and not giving them her phone to delete the video, and removed from their campus.

38. Principal Johnson stated to the deputies, "*I don't think I want her in handcuffs, but I do want a severe consequence and I want her off my campus.*"

39. Principal Johnson and staff did not require the deputies to go arrest, confine in a room, or detain all other students who had recorded the fight, delete their videos, nor remove them from campus.

40. Principal Johnson and staff did not require the deputies to go arrest, confine in a room, or detain the students who were fighting.

41. School counselor Mary Dietrick told the deputies to make an "*example*" out of J.J.

42. She wanted to make an "example" out of J.J. more than the students who were fighting.

43. Neither Johnson nor Dietrick were the deputies' law enforcement supervisors, neither were they law enforcement themselves, to have (falsely) informed J.J. that she committed a felony and would be arrested.

44. The MCSO was responsible for the supervision, training, and compliance with federal and state laws, and the U.S. Constitution, by its deputies at all times material hereto.

45. Beckwith, as an on-duty sworn law enforcement officer acting under color of law, had a duty to comply with federal and state law and the U.S. constitution at all times material hereto, to include the clearly established Fourth and Fourteenth Amendments of which he was on notice.

46. Schrenk, as an on duty sworn law enforcement officer acting under color of law and a SRO at Palm View K – 8, had a duty to comply with federal and state law and the clearly established Fourth and Fourteenth Amendments of which he was on notice.

47. Defendants Beckwith and Schrenck arrived, and without probable cause or reasonable articulable suspicion, and in violation of J.J.'s clearly established constitutional rights to be free from unlawful detention, false arrest, and excessive force, of which they each were on notice, each unlawfully detained, seized, arrested, battered and used excessive force against J.J., based on Principal Johnson' request for an arrest regarding J.J.

having recorded the fight on her phone, although multiple students had recorded the fight on their phones.

48. The deputies' actions were not objectively reasonable nor lawful.

49. At no time had J.J. committed any crime, suspected of a crime, nor provoked Manatee' staff present in the room nor Beckwith or Schrenk.

50. However, Beckwith, a grown male adult, began intimidating and using profanity against this 12-year-old disabled child, who was begging to be freed, asking for her mother, confined to a room against her will, and terrified.

51. Beckwith said to the 12-year-old J.J.:

"*You f\*\*\*\*d up enough to the point where I have to come here. I ain't like these other guys,*" (pointing to the assistant principal and the campus deputy). "*I don't  deal with this s\*\*t.*" "*Are you done with this tantrum or what? You just sit here and cry  and beg for mom a little more,*" he continued minutes later.

52. No later than the following year, MCSO had promoted him to Field Training Officer ("FTO").

53. Beckwith also began walking into the area in the room where J.J. was pacing, her disability exacerbated, her crying intensified, and her fear at being besieged by all these adults verbally threatening her, rising.  So that he could perform an unlawful takedown of this child, he bumped her and/or abruptly placed himself in her path, and then used his unlawful action as guise to allege a battery by the child J.J.  He took her down to the floor, handcuffed her behind her back, where she was in the fetal position to protect herself, crying.  **EXHIBIT A** below.



54. Beckwith and Schrenk then removed J.J. from the school campus under

arrest.

55. The charges against her were dropped.

56. Sheriff Wells of the MCSO later publicly admitted to major reputable news publication *The Bradenton Herald* that MCSO deputies "have no role to play in the enforcement of Manatee County School District policies, including the use of cellphones on campus."

57. Only after the unlawful acts of its deputies, the MCSO then issued a directive to all school resource officers, or SROs, making it clear t

58. The MCSO had failed to both train and supervise its deputies when placing them in school settings where it was foreseeable that the deputies would come into contact with minors in their work environment and be asked by school staff to implement or enforce school police and effectuate arrests, for which the deputies still had legal duty to ensure probable cause existed for any arrests and reasonable articulable suspicion for any detention or seizure of a person or the persons' property.

59. The MCSO found two counts of unbecoming an officer and/or other infractions on Beckwith as a result of his unlawful actions against this

twelve yeard old child..

60. No later than the following year, MCSO had Beckwith assigned to training other officers as a Field Training Officer ("FTO") .

61. Without probable cause, provocation, reasonably articulable suspicion, or legal justification, Schrenk also placed J.J. in handcuffs.  He also unlawfully took J.J. down to the floor at least once during the hour-long unlawful detention and seizure, if not de facto arrest by that time.

62. In fact, footage shows that the deputies escalated J.J.'s disabilities, distress, and trauma.

63. Schrenk grabbed and pushed J.J. more than once in the room where Defendants had her confined against her will; threw and/or took possession of her phone without her consent; and physically took J.J. down, all without probable cause, reasonable articulable suspicion, and despite J.J. having not committed any crime.

64. Body-worn camera shows Beckwith escorting J.J. from the school handcuffed and placed in her the police cruiser, where he transported her to the juvenile detention center.

65.  MCSO charged J.J. with resisting arrest, battery on a law enforcement officer, and battery on a school employee.  All charges against J.J. were dropped.

66. All Defendants caused J.J. to suffer substantial immediate and ongoing damages.

**IV.**

**FEDERAL CLAIMS**

**A. AGAINST MANATEE**

**COUNT I – REPRISAL/RETALIATION UNDER THE AMERICANS WITH DISABILITIES ACT ("ADA") TITLE II**

**(42 U.S.C.A. §§ 12101, 12131(1)(2) [ADA § 201 (1)(2)])**

67. Plaintiff incorporates and re-allege paragraphs 1-43, 52, 60-62, and 65-66, as if plead herein.

68. Defendant Manatee is being sued in its official capacity for violation of the ADA, Title II.

69.  At all times material hereto, J.J. was a qualified disabled minor person/student under the ADA who at all times material hereto, was an

ESE student attending and receiving services, programs, and activities in, at, and from Manatee, on an IEP based on her disabilities.

70. At all times material hereto, Manatee was a public government entity, person, and state actor acting under color of law.

71. At all times material hereto, Manatee was in the care, custody, and control of minor disabled student J.J., and had a duty to protect and safeguard J.J., and not violate her rights under the ADA.

72. Under Title II of the ADA, qualified disabled persons are protected from reprisal/retaliation on the basis of disability in services, programs, and activities provided by State and local government entities.

73. Manatee is a state and/or local government entity public school system under the ADA which receives federal financial assistance.

74. After J.J.'s mother complained to Manatee about its repeat substantial failures to follow J.J.'s IEP, to include missed IEP meetings, provision of disability-related services and programs necessary for J.J. to progress in the goals of her education, and failure to communicate with Cecelia as

required, Manatee's Principal Johnson and counselor Dietrick retaliated against J.J. by retaliatorily singling out and targeting J.J.

75. Cecilia also had disability advocates complaining to Manatee about its failures to provide her required disability-related programs and services under her IEP and filed complaints, and Principal Johnson and staff retaliated with continued targeting of J.J. to include retaliatorily labeling her as a problem student.

76. Principal Johnson was on notice of J.J.'s complaints prior to the fight by the other students, and Johnson and school counselor Dietrick's acts against J.J. of singling out and targeting J.J. from all other students who recorded the fight, demanding J.J. be arrested, and demanding J.J. be removed/expelled from Palm View were glaring unlawful retaliation against J.J. for Cecelia's complaints against the school for failure to provide the required disability-related programs and services.

77. Any assertion by Manatee that its actions were to prevent the sharing of the video are obviously non-legitimate pre-text, or it would have treated all students recording the fight in the same unlawful manner as J.J.

78. Principal Johnson, school counselor Dietrick, and the remaining staff punished and unlawfully acted against J.J. more than against the fighting students. This was due to retaliating against J.J. for the repeat complaints by her mother of Manatee's failure to provide J.J.'s required disability-related services.

79. Even after the charges were dropped, Manatee continued to retaliate against J.J. due to complaints by her mother to DOAH and the DOE of Manatee's failure to comply with J.J.'s IEP and provide J.J.'s disability-related programs and services.

80. Manatee thwarted and interfered with Cecelia's efforts to enroll J.J. in a different school, after having ratified Principal Johnson's unlawful removal of J.J. from Palm View, and unlawful confinement and false reports to police.

81. The DOE found Manatee to have committed multiple deprivations and violations of J.J.'s disability-related rights, and multiple disability-related deprivations against J.J. were evidenced at DOAH.

82. Manatee did not ensure that it communicated methods and ways to internally and externally appeal its unlawful actions to Cecelia, who instead had to obtain assistance from outside disability advocates.

83. Prior to Cecelia's complaints, Manatee had not demanded arrest of J.J.

84. Prior to Cecelia's complaints, Manatee had not demanded permanent removal from Palm View K – 8.

85. Manatee did not treat its non-disabled students recording the fight as it did disabled student J.J.

86. J.J.'s mother was forced to retain counsel to bring this suit and advocate for J.J.'s rights under the ADA.

87. Manatee was also deliberately indifferent to the strong likelihood that its retaliation would result in violations of J.J.'s federally protected rights under the ADA.

88. As the direct and proximate result of Manatee's unlawful reprisal against J.J. in violation of the ADA Title II, J.J. suffered substantial harm and damages, including exclusion from her required and IEP disability-related services and programs, missed days at school, depression,

adverse academic results, physical pain to include immediate and ongoing shoulder and back pain from the retaliatory arrest demanded by Manatee, emotional distress, increased frustration, fear at school and of police, handcuffed and publicly escorted to the police car and taken to the juvenile detention center, decreased desire to attend school, public embarrassment and humiliation, despondency, attorneys fees, and costs.

89. Wherefore, J.J. seeks compensatory damages, Attorneys' fees, and costs, against Manatee.

## COUNT II – FALSE IMPRISONMENT, UNLAWFUL SEIZURE AND DETENTION (42 U.S.C. §1983/ FOURTH AMENDMENT)

90. Plaintiff incorporates and re-allege paragraphs 1-43, 52, 60-61, 65-66, as if plead herein.

91. Manatee is being sued in its official capacity for deprivation of J.J.'s clearly established Fourth Amendment rights to be free from unlawful detention, seizure, and confinement, of which Manatee was on notice.

92. At all times material hereto, Defendant Manatee was a public government entity and state actor acting under color of law.

93. At all times material hereto, Manatee was in the care, custody, and control of J.J., and had a duty to protect and safeguard J.J., and not to unlawfully detain, confine, imprison, or seize, J.J.

94. Under the Fourth Amendment, J.J. had the clearly established constitutional right to be free from false imprisonment, unlawful detention, and unlawful seizure, of which Manatee was on notice to include its employees, agents, representatives, and assigns.

95. Against the will and without the consent of J.J. or her mother, lawful authority or provocation, reasonable articulable suspicion, nor probable cause, and without any crime in effect, Manatee, through its employees, agents, and assigns, intentionally confined minor disabled child J.J. in a secluded room for one hour, and refused to release her despite her pleas, requests, and cries to be set free from Manatee's nonconsensual unlawful confinement, seizure of J.J., and one-hour detention.

96. Manatee's confinement of J.J. was substantial, more than incidental, and was not necessary.

97. Manatee had the option to instead have called J.J.'s mother and just awaited the arrival of her mother as part of de-escalation.

98. Manatee did not require its other students who observed and recorded the fight to suffer the same confinement, seizure, and detention, nor to delete footage of the fight from their phones. Manatee's unlawful actions toward J.J. were intentional after her mother had repeatedly complained about Manatee's noncompliance with J.J.'s IEP.

99. Manatee knew or reasonably should have known that its unlawful confinement, seizure, hour-long detention, and requested arrest, of this minor disabled child with ADHD and behavioral struggles would cause J.J. to suffer substantial and increasing physical pain, mental anguish, frustration, anxiety, fear, and agitation, thereby only exacerbating and escalating her inability to process the situation, follow instructions, concentrate, when confined in a room with multiple adults and police threatening, berating, physically aggressing, and surrounding her for an hour, as opposed to just calling and awaiting the arrival of her mother for this non-criminal situation violating her 4th Amendment rights.

100.   J.J.'s mother was forced to retain counsel to advocate for J.J.'s rights and bring this suit.

101.   As the direct and proximate result of Manatee's false imprisonment, unlawful seizure, and unlawful detention of J.J. and her phone under the Fourth Amendment, J.J. suffered substantial and continuing physical pain in her back and shoulder, mental anguish, emotional distress, depression, anxiety, increased agitation, frustration, fear of police and school personnel, public humiliation and embarrassment, suicidal ideation, self-harm, academic loss, financial loss, costs and expenses, and intellectual and physical decline in her disabilities.

102.   Wherefore, Plaintiff seeks compensatory damages, Attorneys fees, and costs, against Defendant Manatee.

## <u>COUNT III– EQUAL PROTECTION</u>

## <u>(42 U.S.C. §1983/FOURTEENTH AMENDMENT)</u>

103.   Plaintiff incorporates and re-allege paragraphs 1-66 as if plead herein.

104.   Manatee is being sued in its official capacity for its deprivation of J.J. clearly established constitutional right to equal protection under the Fourteenth Amendment, of which Manatee was on notice.

105.   At all times material hereto, Defendant Manatee was a public government entity and state actor acting under color of law.

106.   At all times material hereto, Manatee was in the care, custody, and control of J.J., and had a duty to protect and safeguard J.J., and ensure her right to equal protection was not infringed.

107.   Under the Equal Protection Clause of the Fourteenth Amendment, all persons within the United States are guaranteed equal protection under the laws of the United States, and discriminatory state action against a person based upon a protected class is unlawful.

108.   J.J. is a member of a protected class based on her disabilities and race as an African-American.

109.   As shown herein, multiple federal laws prohibit discrimination based on disability, to include The American with Disabilities Act and IDEA.

110. Yet, Manatee repeatedly, intentionally recklessly and/or with deliberate indifference, deprived J.J. of her rights, access, benefits in and from, and participation in, its disability-related programs, services, and activities, all while J.J. was a qualified and recognized disabled minor student on an IEP through multiple unlawful formal removal and/or expulsion, demanding arrest wherein J.J. was unlawfully arrested, unlawful confinement, and physical harm that it did not cause to J.J.'s non-disabled peers nor other students who recorded the fight.

111. Manatee failed to protect J.J. under the Fourteenth Amendment and ensure J.J. was afforded the same protection and access to the same federal rights in and her education as it did its other students.

112. Manatee knew or reasonably should have known that its deprivations of disabled J.J.'s equal protection under the Fourteenth Amendment would harm J.J. and substantially adversely affect J.J.'s participation and progress in her disability-related services, activities, and programs, and education and educational activities, decrease her socialization skills and

understanding, decease her classroom attendance and receipt of disability-related services and accommodation pursuant to her IEP.

113.   J.J.'s parents were forced to retain counsel to advocate for her rights under the Fourteenth Amendment.

114.   As the direct and proximate result of Manatee's equal protection violations/deprivations under the Fourteenth Amendment against J.J., she suffered immediate and ongoing substantial depression, despondency, decreased desired to attend school, lack of progress in her disability-related services, academic decline, lack of receipt of her disability-related services pursuant to her IEP, psychological decline, mental anguish, physical pain in her back and shoulder, headaches, anxiety, impaired socialization, public embarrassment and humiliation, emotional distress, financial loss, attorneys fees and costs.

115.   Wherefore, Plaintiff seeks compensatory damages, Attorneys fees, and costs, against Manatee.

## COUNT IV – MONELL (FAILURE TO TRAIN AND FAILURE TO SUPERVISE)

116.  Plaintiff incorporates and re-allege paragraphs 1-43, 52, 60-62, and 65-66, as if plead herein.

117.  Manatee is being sued in its official capacity for its municipal liability arising from its policy, custom, and deliberate indifference of systemic and widespread deprivations and violations of the clearly established equal protection under the Fourteenth Amendment against its disabled students, including J.J.

118.  At all times material hereto, Defendant Manatee was a public government entity, person, and state actor acting under color of law.

119.  At all times material hereto, Manatee was in the care, custody, and control of J.J. and its other minor disabled students, and had a duty to protect and safeguard those students and J.J., and ensure their clearly established constitutional right to equal protection was not infringed.

120.  Under *Monell v Dept. of Soc. Serv.* 436 U.S. 658, (1978), municipal liability arises where the governmental constitutional deprivation(s) stems from an express policy, widespread and persistent custom, or single act from an individual possessing policy-making authority

*Pembour v. City of Cincinnati*, 475 U.S., 469, 479 (1986);  failure to

adequately train or supervise with deliberate indifference or intent, *City

of Canton v. Harris*, 489 U.S. 378, 379-89 (1989); and the municipality's

deprivations or actions were the moving force behind the constitutional

injury, *J.K.J. v. Polk Cnty*, 960 F.3d 367, 377 (7th Circuit, 2020), *Connick v.

Thompson*, 563 U.S. 51 (2011).

121.  Manatee's failure to adequately train and supervise its staff in

federal law ADA, IEP, and IDEA requirements and rights for disabled

students to include the right to a Free and Appropriate Education

("FAPE"), and ensure compliance with those federal laws and IEPs

resulted in its deprivation of the clearly established equal protection

under the Fourteenth Amendment for its disabled students, and here

specifically, JJ., and its failure to adequately train and supervise its staff

was the moving factor behind those deprivations.

122.  In the FL DOE's investigation of J.J.'s complaint -- Case No. BESE

2022-0140C – the DOE found Manatee to have widespread violations of

disability-related education laws.  Manatee's widespread and persistent

custom of these deprivations were a result of its failure to train and supervise its staff, and  in turn were the moving force behind Manatee's violations of the disabled students equal protection, to include J.J.

123.   For example, Manatee repeatedly and persistently permitted its employees to:

a.  Not comply with federal and state laws related to the timely and actual development and revision of disabled students' IEPs.

b.  Not properly address IEPs in accordance with federal and state laws prior to removing disabled students to more restrictive placement.  Of the eight students the DOE sampled in IAES, eight students had records that indicated that the students' needs were not being addressed in their IEPs in accordance with the requirements of 34 C.F.R. §§ 300.320 and 300.324, prior to removal to a more restrictive placement.

c.  Not comply with tier -3 placement and District policy in relation to services for its disabled students.  In the DOE's interviews with district staff confirmed that the IAES only provided "EBD unit"

separate rooms or the regular setting. This does not align with the district's statement that Horizons provides the same continuum as other schools in the district.

d. Not timely review IEPs in relation to required and/or needed frequency to determine whether the annual goals for the disabled student were being achieved; and revise the IEP, as appropriate, to address the student's anticipated needs.

**e.** Staff failed to revise IEPS to reflect needed support and services to meet Manatee's "tier 3" structure (smaller class sizes, counseling, character courses, etc.).

f. Fail to properly placed disabled students in the appropriate continuum of alternative placements when placed in home instruction, for students whose behavior impedes their learning or the learning of others.

g. Violate federal and state disability laws district wide.

h.  Deprive and deny its disabled students access to and the benefits of education, services, programs, and activities to which the disabled students have protected rights under federal laws.

124.   The preceding deprivations by Manatee were its custom and widespread against its disabled students, and specifically here, against J.J.

125.   As a result of Manatee's failure to adequately train and supervise its staff district wide, these violations were not just at Palm View K – 8, but spread throughout Manatee's school district.

126.   Manatee, with deliberate indifference foreseeable to cause harm and deprive its minor disabled students under its care, custody, and control, , indirectly adopted, implemented, and established as widespread custom, its policy and custom of failure to train and supervise, which were directly responsible and the moving force for Manatee's deprivation of the constitutionally protected right of equal protection of its disabled students, to include J.J.

127.   At all times material hereto, Manatee's highest and final level of decision and policy makers at its board knew or reasonably should have known of its violations, failure to train, and failure to supervise, and the foreseeable constitutional deprivations and harms against its disabled students as a result, and here specifically, against J.J.

128.   In fact, the DOE required Manatee to train its entire staff disability-relevant staff in IDEA, FAPE, and federal laws; provide a list of all staff to be trained; and provide proof of that training; as corrective action.

129.   The DOE also required Manatee to submit a corrective action plan to cure its disability related noncompliance throughout its school system in other areas of disability law, to include correcting its noncompliance with IEPs, just as it had repeatedly failed to comply with J.J.'s IEP.

130.   The DOE also required Manatee to submit compensatory service plans for the disabled students whose rights it had violated.

131.   Manatee's persistent custom and indirect policy of failure to adequately train and supervise its staff were the direct and proximate

causal connection to its repeat deprivation of the equal protection of its disabled students, to include J.J.

132.   Due to Manatee's failures to train and supervise its employees in disability related law and services, its disabled students – to include J.J. – did not receive nor were they afforded the same educational services, programs, activities, access, progress, and classroom education as their non-disabled classmates.

133.   Manatee knew or reasonably should have known that it was not complying with federal and state laws nor the Fourth Amendment equal protection in its disparate treatment of its disabled students based on their disabilities as compared to their non-disabled students, and/or exercised reckless disregard and deliberate indifference to its widespread custom and the foreseeable adverse consequences and damages its failure to train and supervise its staff to ensure equal protection and prevent disability discrimination caused on its disabled students, including J.J.

134.  As the direct and proximate result of Manatee's equal protection violations/deprivations under the Fourteenth Amendment against J.J., wherein its failure to adequately train and supervise its staff were the moving factors,   J.J. suffered immediate and ongoing substantial preclusion of access to necessary disability related services and programs, access to disability related activities, decreased classroom accommodation and instruction, decreased progress in her educational goals as compared to her non-disabled peers,   decreased classroom attendance and access to the classroom in comparison to her non-disabled peers, despondency, decreased desired to attend school, depression, lack of progress in her disability-related services, academic decline, lack of receipt of her disability-related services pursuant to her IEP, psychological decline, mental anguish, headaches, anxiety, impaired socialization, public embarrassment and humiliation,  emotional distress, financial loss, attorneys fees and costs.

135.  Wherefore, Plaintiff seeks compensatory damages, Attorneys fees, and costs, against Manatee.

## B. <u>AGAINST BECKWITH</u>

## <u>COUNT V – FALSE ARREST/FALSE IMPRISONMENT</u>

## <u>(42 U.S.C. §1983/ FOURTH AMENDMENT)</u>

136.   Plaintiffs incorporates and re-allege paragraphs 1-15, 21-23, 35-66, as

if plead herein.

137.   Defendant Beck is being sued in his individual capacity.

138.   At all times material hereto, Beck was an on duty sworn law

enforcement officer/deputy working for the MCSO and acting under

color of law.

139.   Under the Fourth Amendment, J.J. at all times material hereto had the

clearly established constitutional right to be free from false arrest and

false imprisonment, of which Beckwith was on notice.

140.   Beckwith unlawfully confined J.J. against her will and without the

consent of J.J. or her mother, and arrested J.J., without probable cause,

provocation, or reasonable suspicion, and his actions were not those of a

reasonable objective officer.

141.   Sheriff Wells admitted that J.J. had not broken any crime by recording the fight, and that Beckwith improperly intervened in what should have been a school matter and was <u>not </u>a criminal matter.

142.   Beckwith had a duty as a sworn law enforcement officer to ensure his actions were lawful and not rely on non-law enforcement Principal Johnson to inform him of what constituted a felony and crime, for which he then unlawfully confined and arrested J.J., and took her to the juvenile detention center.

143.   Beckwith also repeatedly cursed the 12-year-old minor student J.J.

144.   All charges against J.J. of resisting arrest without violence, battery on a law enforcement officer, and battery on a school employee were dropped.

145.    Beckwith was eventually reprimanded but then assigned by MCSO to train officers as a Field Training Officer.

146.   Beckwith's confinement of J.J. was substantial, more than incidental, and caused physical harm to J.J.

147.  Beckwith knew or should have known by arresting a student at an elementary school and confining her for an hour while increasing agitating and threatening the student, that it was foreseeable that his unlawful actions would cause substantial harm to the student, that she would not be able to focus or concentrate, that she would be afraid of being converged upon and threatened by multiple adults to include police, and that she would not be able to process the situation or follow orders due to the fear, anxiety, and frustration of the unlawful confinement, takedowns, handcuffing, humiliation, and arrest.  He knew that he was engaging a minor who was not even yet a teenager, but did so as if engaging and speaking to a full-grown man

148.  J.J.'s mother was forced to retain counsel to bring this suit.

149.  As the direct and proximate result of Beckwith's false arrest and false imprisonment under the Fourth Amendment, J.J. suffered immediate and ongoing physical pain in her back and shoulder, false arrest, handcuffs, transport to the juvenile detention center handcuffed, public humiliation, embarrassment, depression, despondency, self-harm, anxiety, trauma,

nightmares, fear of police, physical decline, mental decline, mental anguish, emotional distress, unlawful confinement, academic decline, disability-related loss of services and programs, loss of access to her disability-related services and programs pursuant to her IEP, expulsion, financial loss, Attorneys fees and costs.

150.   Wherefore, Plaintiff seeks compensatory damages, Attorneys fees, and costs, against Beckwith.

## C. <u>AGAINST SCHRENK</u>

## <u>COUNT VI – FALSE ARREST/FALSE IMPRISONMENT</u>

## <u>(42 U.S.C. §1983/ FOURTH AMENDMENT)</u>

151.   Plaintiffs incorporates and re-allege paragraphs 1-15, 21-23, 65-66, as if plead herein.

152.   Defendant Schrenk is being sued in his individual capacity.

153.   At all times material hereto, Schrenk was an on duty sworn law enforcement officer/deputy working for the MCSO and acting under color of law.

154.   Under the Fourth Amendment, J.J. at all times material hereto had the clearly established constitutional right to be free from false arrest and false imprisonment, of which Schrenk was on notice.

155.   Schrenk unlawfully confined J.J. against her will and without the consent of J.J. or her mother, and arrested J.J., without probable cause, provocation, or reasonable suspicion, and his actions were not those of a reasonable objective officer.

156.   Sheriff Wells admitted that J.J. had not broken any crime by recording the fight, and that his deputies improperly intervened in what should have been a school matter and was not a criminal matter.

157.   Schrenk had a duty as a sworn law enforcement officer to ensure his actions were lawful and not rely on non-law enforcement Principal Johnson to inform him of what constituted a felony and crime, for which he then unlawfully confined and arrested J.J., handcuffed her, and performed unlawful takedowns, and caused her to be transported to the juvenile detention center.

158.   All charges against J.J. of resisting arrest without violence, battery on a law enforcement officer, and battery on a school employee were dropped.

159.   Schrenk's confinement of J.J. was substantial, more than incidental, and caused physical harm to J.J.

160.   Schrenk knew or should have known by arresting a student at an elementary school and confining her for an hour while increasing agitating and threatening the student, that it was foreseeable that his unlawful actions would cause substantial harm to the student, that she would not be able to focus or concentrate, that she would be afraid of being converged upon and threatened by multiple adults to include police, and that she would not be able to process the situation or follow orders due to the fear, anxiety, and frustration of the unlawful confinement, takedowns, handcuffing, humiliation, and arrest.  He knew that he was engaging a minor who was not even yet a teenager, but did so to include physically as if engaging an adult.

161.   J.J.'s mother was forced to retain counsel to bring this suit.

162.   As the direct and proximate result of Schrenks's false arrest and false imprisonment under the Fourth Amendment, J.J. suffered immediate and ongoing physical pain in her back and shoulder, false arrest, handcuffs, transport to the juvenile detention center handcuffed, public humiliation, embarrassment, depression, despondency, self-harm, anxiety, trauma, nightmares, fear of police, physical decline, mental decline, mental anguish, emotional distress, unlawful confinement, academic decline, disability-related loss of services and programs, loss of access to her disability-related services and programs pursuant to her IEP, expulsion, financial loss, Attorneys fees and costs.

163.   Wherefore, Plaintiff seeks compensatory damages, Attorneys fees, and costs, against Schrenk.

## D. AGAINST SHERIFF WELLS/MCSO

## COUNT VII – MONELL (FAILURE TO TRAIN AND FAILURE TO SUPERVISE)

164.   Plaintiff incorporates and re-allege paragraphs  1-15, 21-23, 65-66, as if plead herein.

165.   Sheriff Wells/MCSO ("MCSO") is being sued in its official capacity for its municipal liability arising from its policy, custom, and deliberate indifference of systemic and widespread failure to train and failure to supervise, resulting in and the moving force behind deprivations against J.J. and the citizenry under the Fourth Amendment.

166.   At all times material hereto, Defendant MCSO was a public government entity, person, and state actor acting under color of law.

167.   At all times material hereto, J.J. and the citizenry -- here minor students  have the clearly established Fourth Amendment right to be free from false arrest, false imprisonment, unlawful detention, and unlawful seizures, of which MCSO was on notice.

168.   Knowing that it was placing on duty sworn law enforcement deputies in elementary schools as SRO's wherein the deputies would engage and encounter minor children in matters of discipline that were only school related and not for intervention by the deputies and where no crime had been committed, MCSO intentionally or with reckless disregard and deliberate indifference failed to adequately train and

supervise its staff into the policy that the deputies were not to intervene in non-criminal school related matters or disciplinary matters, and to refuse the school's request to intervene and effectuate arrest, detention, or seizure, in non-criminal matters.

169.   It was foreseeable to MCSO that school administrators and educators would believe that they could demand arrests and other legal acts against children, and it was foreseeable to MCSO that, because the deputies were being placed in elementary schools, that non-criminal disciplinary matters or school matters would arise amongst school relations with such young children, which could be resolved and should be resolved between the school and parents.

170.   MCSO failure to adequately train and supervise its deputies caused and was the moving force behind the Fourth Amendment deprivations of J.J.

171.   This custom and policy was known all the way to the final decision maker and Sheriff.  In fact, Schrenk called MCSO to obtain further instruction as part of his unlawful acts toward J.J.

172.  For example, MCSO <u>repeatedly and persistently permitted</u> its

deputies to:

    a.  Unlawfully seize students and the citizenry without probable

        cause or reasonable articulable suspicion, as they did  J.J.

    b.  Unlawfully detain students and the citizenry without probable

        cause of reasonable articulable suspicion as they did J.J.

    c.  Unlawfully arrest the citizenry and students without probable

        cause, as they did J.J.

    d.  Unlawfully confine the citizenry against their will and without

        their consent, for substantial periods of time, as they did J.J.

    e.  Intervene into purely school-related non-law enforcement matters,

        as they did J.J.

    f.  Unlawfully base probable cause for arrests and reasonably

        articulable suspicion for  detention on the non-criminal and

        unlawful acts and orders of school personnel;

    g.  Unlawfully detain and arrest the citizenry and students despite

        knowing that no crime has been committed, as they did J.J.

    h. Manufacture and create the basis of a crime where none exists against the citizenry and students, as they did J.J.

    i. Violate the clearly established Fourth Amendment rights of the citizenry and students to be free from unlawful seizure, unlawful detention, false arrest, and false imprisonment as they did J.J.

173.  The preceding deprivations by MCSO were its custom and widespread policy against the citizenry and students, and specifically here, against J.J.

174.  To that point, Sheriff Wells commenced training of all deputies in not interfering with school matters after the unlawful acts against J.J. complained of herein.

175.  And despite known that J.J. had not committed a crime, MCSO's guidance to Schrenk still effectuated a false arrest, false imprisonment, unlawful seizure, and unlawful detention of J.J.

176.  As a result of MCSO's failure to adequately train and supervise its deputies, J.J.'s Fourth Amendment rights were violated.

177.   The MCSO, with deliberate indifference foreseeable to cause harm and deprive the citizenry, students, and J.J., which it engaged inside schools and on school campuses, indirectly adopted, implemented,  and established as widespread custom, its policy and custom of failure to train and supervise, which were directly responsible and the moving force for MCSO's deprivation of the constitutionally protected right of equal protection of its disabled students, to include J.J.

178.   At all times material hereto, MCSO's highest and final level of decision and policy makers at its board knew or reasonably should have known of its violations, failure to train, and failure to supervise,  and the foreseeable constitutional deprivations and harms against its disabled students as a result, and here specifically, against J.J.

179.   The MCSO's persistent custom and indirect policy of failure to adequately train and supervise its deputies were the direct and proximate causal connection to its repeat deprivation of the equal protection of its disabled students, to include J.J.

180.  Due to MCSO's failures to train and supervise its deputies in its policies for SROs,  students – to include J.J. – suffered harm from violations of their Fourth Amendment rights.

181.  MCSO knew or reasonably should have known that its reckless disregard and deliberate indifference to its widespread custom and the foreseeable adverse consequences and damages its failure to train and supervise would cause under the Fourth Amendment, including J.J.

182.  As the direct and proximate result of MCSO's equal protection violations/deprivations under the Fourteenth Amendment against J.J., wherein its failure to adequately train and supervise its staff were the moving factors,  J.J. suffered immediate and ongoing substantial damages and harm, to include false arrest, prolonged unlawful confinement, physical injury to her shoulder and back, pain to her shoulder and back, self-harm, depression, anxiety, fear, preclusion of access to necessary disability related services and programs, access to disability related activities, decreased classroom accommodation and instruction, decreased progress in her educational goals as compared to her non-

disabled peers, decreased classroom attendance and access to the classroom in comparison to her non-disabled peers, despondency, decreased desired to attend school, depression, lack of progress in her disability-related services, academic decline, lack of receipt of her disability-related services pursuant to her IEP, psychological decline, mental anguish, headaches, anxiety, impaired socialization, public embarrassment and humiliation, emotional distress, financial loss, attorneys fees and costs.

183. Wherefore, Plaintiff seeks compensatory damages, Attorneys fees, and costs, against MCSO.

184. Wherefore, Plaintiffs individually seek compensatory damages, Attorneys fees, and costs, against Defendant for Plaintiff William Corley, Plaintiff Kia Bellere, and Plaintiff Z.C.

## VIII.  <u>ATTORNEYS FEES</u>

185. If Plaintiff prevails in this action, by settlement or otherwise, Plaintiff is entitled to and hereby demands attorney's fees under 42 U.S.C. §1988.

## <u>IX.</u>
## <u>PRAYER FOR RELIEF AND DAMAGES</u>

**WHEREFORE**, all above premises considered, Plaintiff humbly requests this Honorable Court:

A. Enter judgment in Plaintiff's favor and against all Defendants for all claims and damages requested herein, including attorneys' fees under 42 U.S.C. §1988, costs, and such other relief both legal and equitable that this Court deems just and proper under the law.

## X.
## JURY DEMAND

Plaintiffs respectfully demand a jury trial in this matter on all claims.

Respectfully Submitted this 22nd **day of September 2025**

By:/s/ Frank T. Allen
Florida Bar No. 0033464
Frank Allen, Esquire
2582 Maguire Rd.
Ocoee, Florida 34761
Telephone: (407) 481-8103
Email: Allen551@aol.com
Lead Counsel for Plaintiff

56